## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 15 2016, 5:39 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

P. Jeffrey Schlesinger
Appellate Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| L.C. Strong,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | December 15, 2016<br><br>Court of Appeals Case No.<br>45A03-1512-CR-2315<br><br>Appeal from the Lake Superior Court<br><br>The Honorable Samuel L. Cappas, Judge<br><br>Trial Court Cause No.<br>45G04-1401-MR-1 |

**Crone, Judge.**

# Case Summary

[1] L.C. Strong appeals his conviction for murder. He argues that the evidence is insufficient to support his conviction and that the prosecutor committed misconduct during closing argument. Concluding that the evidence is sufficient and that the prosecutor did not commit misconduct, we affirm.

# Facts and Procedural History

[2] In February 1979, Strong lived with his family at 2355 Roosevelt Street in Gary. He owned an Oldsmobile and had a mustache. Twenty-eight-year-old Linda Martin lived with her family in a Gary apartment building approximately two miles from Strong's residence. On the evening of February 20, 1979, Martin was wearing her wig when she left her apartment to work as a bartender at the Blue Room Lounge. She had to walk to work because she had given her last quarter to her daughter and did not have enough money for the bus fare. When Martin got off work, she went to the Playboy Lounge ("the Lounge"), where she was a "regular." Tr. at 59. Martin frequently walked to the Lounge because she did not have a car, and it was within walking distance of her apartment.

[3] Martin left the Lounge just after midnight. Felton Walls, Jr., whom Martin had lived with and previously dated, came to the Lounge so that he could give Martin a ride home, but the owner of the Lounge told Walls that Martin had left ten minutes earlier. Martin never returned home after leaving the Lounge.

[4] On February 21, 1979, at 6:35 a.m., Martin's dead body was found in the snowy road in the 2300 block of Rutledge Street, about one mile from the Lounge and three blocks from Strong's residence. Police saw boot impressions in the snow by Martin's body, and it looked like someone had placed her body there. The coroner certified that Martin was dead at the scene but noted that rigor mortis had not yet set in. According to the coroner, "Rigor mortis is when the body becomes very stiff and it has usually been dead for a number of hours." *Id*. at 153. Martin had bruising on her face and neck and slight nail impressions on her throat. She was wearing a brown jacket with a button missing, an unbuckled belt, partially-zipped pants, and a black one-piece body suit that was inside out. Martin's wig was gone.

[5] The autopsy indicated that Martin's cause of death was external violence to the neck "consistent with strangulation." *Id*. at 195. Martin had scratches "consistent with fingernail marks" on her neck and hemorrhages in her larynx and vocal cords. State's Ex. 57A. The coroner collected a hair found on her left breast that appeared to be from a mustache. Investigators sent evidence to the toxicology laboratory for testing, which confirmed that the rape kit contained semen, that blood and semen were present on the crotch of Martin's pants, and that blood was present on her fingernail clippings. Microscopic examination showed that the pubic hair combings taken from her body

contained hair that was "dissimilar" to Martin's.[1]  *Id*. at 314.  In 1979, DNA testing had not yet been implemented.  Police were unable to identify any suspects at that time.

[6] In May 2012, Commander Matthew Eaton of the Lake County Sheriff Department's Criminal Investigations Division began investigating Martin's murder.  He conducted multiple interviews and sent the previously collected evidence to the Indiana State Police Laboratory for DNA testing.  A sample from the crotch of Martin's bodysuit contained a major DNA profile.  This preliminary investigation enabled Commander Eaton to identify Strong as a possible suspect.  Commander Eaton interviewed Strong, who was incarcerated in Michigan for second-degree murder, and took a DNA sample from Strong pursuant to a warrant.

[7] Commander Eaton's interview with Strong was recorded.  During the interview, Strong denied that he lived at 2355 Roosevelt Street in 1979.  He claimed that he did not know where Rutledge Street was, even though he was able to name the other streets in the area and Rutledge Street is only three blocks from Roosevelt Street.  He stated that he once tried to go into the Lounge but was turned away at the door due to improper attire.  He repeatedly

---

[1] Microscopic examination of hairs found on her left breast and forearm showed that they had "Negroid type characteristics."  Tr. at 313-14.  Strong and Martin are both African-American.  The State claims that the hairs were dissimilar to Martin's hair.  Appellee's Br. at 8.  However, Larry Huys, the former supervisor of the Northwest Indiana Toxicology Laboratory, where the initial examination of the hairs was completed, testified that "no conclusion could be reached [relative to Martin's hair]."  Tr. at 313-14.  Huys testified that the hairs in a brown hat found near Martin's body were "dissimilar" to Martin's hair.  *Id*. at 311.

denied ever knowing anyone named Linda or any woman with the last name Martin. Commander Eaton showed Strong a photograph of Martin, but he denied ever having seen her. Strong also stated that he scrapped the Oldsmobile in 1979, bought a new car in 1980, and moved to Michigan.

[8] The DNA testing revealed that the DNA profile from the crotch of the bodysuit matched Strong's DNA with a statistical frequency of one in one billion unrelated individuals. *Id*. at 546. In addition, the DNA testing was able to exclude the DNA profiles of Martin, Walls, and all four of Strong's brothers. *Id*. at 547. The rape kit contained an insufficient quantity of DNA for a full profile, but Y-STR analysis[2] indicated that the Y-STR DNA profile from the rape kit was consistent with Strong's Y-STR DNA with a statistical frequency of one in 2732 Caucasian men, one in 1789 African-American men, and one in 1305 Hispanic men. *Id*. at 570. Y-STR analysis was also performed on Martin's fingernail clippings and revealed a Y-STR DNA profile that was consistent with Strong's Y-STR DNA with the same statistical frequency as described above. *Id*. at 574-75.

[9] On January 24, 2014, the State charged Strong with murder. A jury trial was held from October 19 to 22, 2015. Strong testified in his defense. He admitted that he lived at 2355 Roosevelt Street in 1979 at the time of the murder and explained that he was confused when he was interviewed by Commander Eaton. *Id*. at 639, 643. Strong testified that he never went to the Lounge, had

---

[2] "Y-STR analysis is developing a DNA profile that is specific to the 'Y' chromosome." Tr. at 567.

not known Linda Martin, had not had sexual relations with her, and had not murdered her. *Id*. at 638, 654, 655-56. The jury found Strong guilty as charged. The trial court sentenced him to an executed term of fifty years. This appeal ensued.

# Discussion and Decision

## Section 1 – Sufficient evidence supports Strong's murder conviction.

[10] Strong challenges the sufficiency of the evidence supporting his murder conviction. In reviewing a claim of insufficient evidence, we do not reweigh the evidence or judge the credibility of witnesses, and we consider only the evidence that supports the judgment and the reasonable inferences arising therefrom. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). "We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt." *Id*. The evidence need not "overcome every reasonable hypothesis of innocence." *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007). "Elements of offenses and identity may be established entirely by circumstantial evidence and the logical inferences drawn therefrom." *Bustamante v. State*, 557 N.E.2d 1313, 1317 (Ind. 1990). "Any testimony tending to show an accused's attempt to conceal implicating evidence or to manufacture exculpatory evidence may be considered by the trier of fact as relevant because it reveals a consciousness of guilt." *Hughes v. State*, 546 N.E.2d 1203, 1208 (Ind. 1989).

[11]     To convict Strong of murder, the State was required to prove beyond a reasonable doubt that he knowingly or intentionally killed Linda Martin. Ind. Code § 35-42-1-1(1). The evidence supporting the verdict shows that Martin left the Lounge at midnight and was on foot. Strong owned a car, which he scrapped after the murder. The Y-STR analysis from the rape kit strongly supports that he had sexual contact with Martin. Even though the Y-STR analysis could not rule out his brothers, the DNA profile on the crotch of Martin's bodysuit matched Strong's DNA profile with a statistical frequency of one in one billion and excluded Strong's brothers as contributors. Tr. at 546-47. Yet, Strong denied having any sexual contact with Martin and denied even knowing her. He changed his stories regarding where he lived in 1979 and whether he had ever gone to the Lounge. The autopsy revealed that Martin was strangled to death. The Y-STR profile found on Martin's fingernails was consistent with Strong's and supports a reasonable inference that she fought him. Strong lived only three blocks from where Martin's body was found.

[12]     Strong concedes that although he denied knowing Martin or having sexual contact with her, the DNA evidence implies that he had sexual contact with her. However, he asserts that after thirty-six years, he simply might not have remembered Martin, the semen could have been deposited twenty-four to seventy-two hours prior to the sample being taken, the DNA evidence does not show that their sexual contact was involuntary, and the fingernail DNA could have come from voluntary intercourse. Strong's argument is an invitation to reweigh the evidence, which we must decline. We conclude that there was

sufficient evidence to support Strong's murder conviction.  *See Drane*, 867 N.E.2d at 147-48 (evidence that Drane, on the night of victim's murder, talked to victim multiple times, made arrangements to see her, and had sexual intercourse with her, and that his van was seen parked for several hours in the park near where victim's body was later discovered was sufficient to support convictions for rape and murder).

## Section 2 – The prosecutor did not commit misconduct.

Strong argues that the prosecutor committed misconduct during closing argument by remarking,

> All the facts that have been presented to you throughout the course of the last couple of days lead to one and only one conclusion.  And that conclusion is the defendant, L.C. Strong, murdered Linda Martin on February 21st of 1979.  The State asks that you consider all the evidence and you render that verdict and *tell Linda Martin that justice has finally been found*.

Tr. at 670 (emphasis added).

Strong asked for an admonishment that would inform the jury "not to dwell on the concerns of the victim or the sympathy," but the trial court refused.  *Id*. at 671.  The trial court allowed Strong to address the prosecutor's remark in his closing argument, at the beginning of which he stated,

> You're going to get an instruction from the Judge that reads in part:  As honest upright men and women charged with the … [r]esponsible duty of aiding the Court in the administration of justice, you will put aside all sympathy and sentiment and look

only to the law and the evidence in the case and return into court
such a verdict as is warranted thereby.

*Id*. at 673-74. The trial court instructed the jury accordingly. *Id*. at 688;
Appellant's App. at 118.

[15] Our standard of review is well established:

> In reviewing a claim of prosecutorial misconduct properly raised
> in the trial court, we determine (1) whether misconduct occurred,
> and if so, (2) whether the misconduct, under all of the
> circumstances, placed the defendant in a position of grave peril to
> which he or she would not have been subjected otherwise. A
> prosecutor has the duty to present a persuasive final argument
> and thus placing a defendant in grave peril, by itself, is not
> misconduct. Whether a prosecutor's argument constitutes
> misconduct is measured by reference to case law and the Rules of
> Professional Conduct. The gravity of peril is measured by the
> probable persuasive effect of the misconduct on the jury's
> decision rather than the degree of impropriety of the conduct. To
> preserve a claim of prosecutorial misconduct, the defendant
> must–at the time the alleged misconduct occurs–request an
> admonishment to the jury, and if further relief is desired, move
> for a mistrial.

*Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014) (citations and quotation marks
omitted).

[16] Specifically, Strong contends that the prosecutor, by requesting that the jury
"tell Linda Martin that justice has finally been found," Tr. at 670, implied that
"the jury should find Mr. Strong guilty in part due to the great lapse of time
between the crime and his trial." Appellant's Br. at 6. We observe that "[i]t is

misconduct for a prosecutor to request the jury to convict a defendant for any reason other than his guilt." *Cooper v. State*, 854 N.E.2d 831, 837 (Ind. 2006) (quoting *Coleman v. State*, 750 N.E.2d 370, 375 (Ind. 2001)).

[17] In support of his argument that the prosecutor's comment constitutes misconduct, Strong relies on *Neville v. State*, 976 N.E.2d 1252 (Ind. Ct. App. 2012), *trans. denied* (2013). There, the defendant alleged multiple instances of prosecutorial misconduct including that the prosecutor stated in closing argument that "[o]nly you have the power to get justice for the family who had to lose their son, their nephew." *Id.* at 1263. The *Neville* court concluded that the prosecutor's comment "urging the jury to provide justice and find Neville guilty for the sake of [the victim] and his family '[had] no bearing on the defendant's guilt or innocence'" and was improper. *Id.* at 1264 (quoting *Limp v. State*, 431 N.E.2d 784, 788 (Ind. 1982)).

[18] Considering the context of the prosecutor's comment in *Neville*, we conclude that case is easily distinguishable. The prosecutor stated,

> But now is the point in this trial that you can find that for 3 days now you've been sitting 20 feet from a murderer. And–only thing about it, I can't do a thing about it. As [the other prosecuting attorney] told you in opening, voir dire, folks all I can do is put this man in this chair. All Detective Tudor can do is put this man in this chair, beyond that I am powerless. Only you have the power to get justice for the family who had to lose their son, their nephew.

*Id.* at 1263. Here, in contrast, the statements preceding the alleged improper comment emphasized that the jury should consider the evidence that had been presented throughout the course of the trial and base the verdict on that evidence.

[19] The challenged comment in this case is similar to one that we upheld in *Hand v. State*, 863 N.E.2d 386 (Ind. Ct. App. 2007). There, the defendant challenged the prosecutor's comment urging the jury to convict for the victim, her children, and the community as a whole. *Id.* at 396. We concluded that "the gravamen of those comments was that the evidence presented at trial supported the State's charges and, therefore, Hand should be held accountable for his actions and convicted." *Id.*

[20] We agree with the State that the prosecutor's "remark that the verdict would 'tell Linda Martin that justice has finally been found' was nothing more than a comment that the evidence presented at trial would support the State's murder charge, and, therefore, bring an end to this case." Appellee's Br. at 14 (citing Tr. at 670). Accordingly, we conclude that the prosecutor's comment was not misconduct. Moreover, even if it was improper, it would not require reversal. Strong began his closing argument by telling the jurors that they would be instructed "to put aside sympathy and sentiment and look only to the law and the evidence in the case," and they were so instructed. Tr. at 673-74. As such, the prosecutor's isolated statement did not place Strong in a position of grave peril to which he should not have been subjected. Therefore, we affirm his murder conviction.

Affirmed.

Kirsch, J., and May, J., concur.